# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2021-2233

_____

MICHAEL VINCENT FOGARTY,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____


On appeal from the Circuit Court for Bay County.
Dustin Stephenson, Judge.


December 18, 2024

TANENBAUM, J.

A jury found Michael Fogarty guilty of sexual battery on a helpless person, a violation of section 794.011(4)(b), Florida Statutes, a first-degree felony punishable by up to thirty years in prison. Under the legislatively directed sentencing scoresheet regime, Fogarty's lowest permissible sentence for the offense of conviction was nine years' imprisonment. *Cf.* § 921.0024, Fla. Stat.; *see also* § 921.0022(3)(i), Fla. Stat. (classifying this offense as level nine, the second highest in terms of "severity"). The trial court sentenced Fogarty to ten years' imprisonment, rejecting the arguments made by Fogarty's counsel for a sentence below the nine-year floor, determining there was no factual basis for any such departure. Fogarty now appeals both the judgment and the sentence, raising several possible grounds for reversal, all which we reject. We affirm and write to address one—his argument that

the trial court should have granted his request for acquittal at the close of the State's case-in-chief.

I

To do this, we first set out the pertinent facts the State demonstrated through its evidence. J.W., the victim, was twenty-one years old and engaged to Shawn, with whom she shared an apartment at the time of the incident. For the first time in a while, J.W. and Shawn each had the same day off—a Friday at that. They celebrated with a picnic, each having a single beer. The day wore on, and Shawn texted his childhood friend, Fogarty, also twenty-one years of age at the time. Fogarty invited the couple to the bar where he worked. J.W. had met Fogarty a few years earlier when she started dating Shawn, the three occasionally hanging out socially as friends since. That night, the bar was offering two-for-one drink specials, and the couple accepted. Shawn had several drinks; J.W. apparently had four or five. Fogarty joined them in the drinking after his shift ended. J.W. and Shawn eventually left for home, Fogarty telling them he would come by after a stop at his own residence.

The drinking did not stop there, though. Once they arrived home, Shawn and J.W. both had more alcoholic beverages. Shawn went to bed around midnight because he had to work early the next day. Shawn's trial testimony described J.W. at that moment as drunk to the point her sobriety was "almost non-existent," J.W. tending to agree in her testimony that she was "pretty, pretty tipsy." Shawn having gone to bed, J.W. continued to drink, Fogarty then arriving around 1:00 a.m. Fogarty and J.W. drank and smoked cigarettes together, joined by neighbor-and-inebriated friend James around 2:00 a.m., James testifying that when he arrived, Fogarty and J.W. already appeared intoxicated. After James left around 3:00 a.m., Fogarty and J.W. left to buy more alcohol and cigarettes, the two continuing to drink once they returned to Shawn and J.W.'s apartment. By this time, as J.W. testified about her own state of mind, she was "going in and out," recalling the alcohol run but not the purchase or anything afterward, stating, "I don't really, I don't know what happened at that point, what we did."

2

Shawn testified his alarm clock woke him up for work at 5:45 that morning. He wandered out of the bedroom to find J.W. unconscious on the couch. Shawn described for the jury her unusual positioning as follows: "Her arms were kind of straight above her head like this, and then her pants were pulled down to the ankles, her shirt was pulled up; I believe she might have had a bra on, but breasts were definitely exposed, and her underwear was pulled to the side." J.W. was "unconscious" and non-responsive when Shawn shook her to wake her up. Shawn then heard a scraping noise by the back door. According to his testimony, not able to see the door from where he was, but hearing it close, Shawn

> started running in that direction because obviously I kind of realized something has happened and I assume whoever just went through that back door is the responsible party, so I kind of give chase, as it were. And I get through the back door and then I'm in our back yard area.

He remembered passing the air conditioning unit in the backyard, ending up in the front yard, and having not seen anyone, going back inside. Shawn did notice Fogarty's car still in the parking lot and Fogarty's glasses still by the television in the living room. After again trying to get J.W. "to some semblance of consciousness," without success, Shawn called 911.

Paramedics and police responded. The paramedics took J.W. to the hospital while an officer interviewed Shawn at the apartment—Fogarty appearing as the interview was going on, claiming to have been passed out but also vomiting out back. Once the interview was over, Shawn went to the hospital to see J.W., who still was not "quite all the way sober" when he arrived. Another officer, meanwhile, interviewed Fogarty on-scene at the apartment around 8:00 the same morning, an interview that was recorded and played for the jury. The officer described Fogarty's speech as "[a]rticulated, well spoken, [and] clear," his balance normal, his movement fine.

Fogarty described for the officer how J.W. had drunk more than he did overall: ten beers and maybe three or four shots. He explained to the officer how, around 3:00 a.m. (just five hours prior to the interview), he had driven J.W. to the gas station so she could

3

buy more beer and cigarettes, Fogarty staying in the car once there, J.W. going inside. He made the following observation regarding her state of drunkenness:

> So if I had to give her a message to the sober her, from, you know, as part of the drunk her, I would say that she should pick a point in time in her drunk to stop drinking. She needs to like find a, find a better stopping point. You know, don't think that because -- when you're out of alcohol, maybe don't go get more, you know what I mean? Yeah. Maybe not take a couple shots because you've been drinking your beer slowly. Just find your happy medium.

Contrasting this with his own approach to drinking, Fogarty explained:

> Me in particular, I like to drink beer because I don't get as drunk and I can control my drunk better and I can see how drunk I'm getting while I'm getting drunk, you know what I mean? I can, I can stop, I coherently say all right, I'm getting a little too drunk now, I'm good. With liquor it doesn't work that way; you take a few shots, you don't (inaudible).

> Once back at the apartment, it went like this, according to Fogarty:

> I moved that chair forward to the other side of the table to sit in front of her when we got back, because I could tell how drunk she was when we showed back up here [at the apartment] after the gas station, you know what I mean? And I wasn't exactly sober. And I moved that chair up because that's where she had the ashtray, she was smoking, I was smoking. She was nodding off, and I was like hey, are you good, do you need to go to bed? She told me she was fine, which she always tells us.

> . . .

> We got back here, and I finished one beer, I think, and that is about the last thing I remember. I remember her falling asleep somewhat, you know, like starting to nod

4

off in her chair, and the last time we hung out she did the very same thing, and last time we hung out she almost fell to the ground, so this time around, you know, I was like hey, I grabbed her, I was like hey, are you okay? She was like uh yeah, you know what I mean, like kind of grunted, yeah I'm fine, I'm fine. I was like alright, well, come on, and I walked her to the couch, I didn't have to carry her until about halfway. She stood up all right, and then she wasn't walking good, it was basically me half-ass dragging her to the couch. And I lay her down, it was awkward, I didn't want to try and like lift her up and maneuver her more than I needed to. And just dragging her had my [sic] super out of breath.

. . .

Whenever I was dragging her, my glasses fell off, I just kind of left them where they -- I picked them up off the ground and put them where they were, but I just kind of left them where they lay.

. . .

I don't know what time I left from in there, I have no idea what time it was when I put her on the couch and went outside to throw up.

Fogarty's recorded statement demonstrated his ability—in the morning, just a few hours after J.W. supposedly was lain on the couch—to speak at length about many details of the night before. Regarding the details immediately before and after J.W. ended up on the couch, however, Fogarty did not have the same recall:

I don't necessarily, when I was recalling my story to you, in between drinking and getting home and putting her to sleep, the elapsed time is kind of up there, because we were just chitchatting, talking, and you know what -- I wasn't keeping track of time, I couldn't even tell you what we talked about. I remember putting her to bed, I remember coming home, you know what I mean? . . . But I was kind of wasted, so. From there to there I remember

5

everything, or kind of remember everything. Up to a certain point, I got it all, my memory is clear, but for the last few hours, you know, sh*t's, sh*t's kind of hazy.

He nevertheless remembered that when he moved J.W. to the couch, her pants were still on, but wet, noting in the interview he did not want Shawn to think "something happened to his girlfriend, and because they just don't know, and her pants was off, he's f***ing distraught."

J.W., meanwhile, arrived at the hospital around 6:30 a.m. smelling of alcohol and urine, described by a sexual assault nurse as being so intoxicated that she was "continuously falling asleep" and "passing out." She lacked focus, had difficulty holding a steady conversation, even falling asleep mid-sentence, not having sufficient lucidity to give informed consent to a sexual assault exam. A police officer responding to the hospital testified that when she tried to talk with J.W., she appeared to be "extremely intoxicated," "very loose," and "very confused about what was going on and why she was there." According to the officer, J.W.'s "eyes would drop down, she was just very sleepy, and not very lucid," her speech "extremely slurred." The officer testified that J.W.'s condition was so bad that when asked for her phone number, J.W. responded with her ZIP code[1]—"that's how off she was." Indeed, J.W. was too intoxicated to give a complete statement, so the officer had to return later in the day, around 2:00 p.m., to take the statement. Upon returning, the officer noted that J.W. seemed back to normal, a "completely different person, she was much more perky," and her voice and thoughts were clearer. J.W. had consented to the sexual assault exam by the time the officer returned.

The exam yielded male DNA taken from J.W.'s underwear waistband and crotch area and from her vagina and cervix, the DNA proving to be a match for Fogarty, a crime lab analyst

---

[1] "ZIP" refers to the U.S. Postal Service's Zone Improvement Plan, a system of codes introduced in 1963 and still in use today. *See* Abby Curtin, "Flashing Across the Country," THE SMITHSONIAN'S NAT'L POSTAL MUSEUM, *available at* https://postalmuseum.si.edu/flashing-across-the-country.

testifying that the "observed foreign DNA profile is greater than 700 billion times likely to occur if these samples originated from Michael Fogarty than from an unrelated individual."[2]

## II

Fogarty contends the trial court erred by denying his motion for judgment of acquittal made at the close of the State's case, arguing on appeal that the State did not present sufficient evidence of J.W.'s state of unconsciousness or lack of consent. He focuses on the fact that neither J.W. nor he had any memory of their having sex. This is a question we review *de novo. See Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002) ("In reviewing a motion for judgment of acquittal, a de novo standard of review applies.").

The criminal charge against which Fogarty stood trial was the first-degree felony of sexual battery on a helpless person.[3] For the State to make its case, it had to prove the following elements:

---

[2] Fogarty moved for a judgment of acquittal at the close of the State's case, the denial of which we address here. He did not renew the motion at the close of his case, and he does not raise on appeal any failure by the trial court to acquit him as a matter of law at the close of all the evidence. Even though Fogarty presented a defense case, which included his own testimony, we do not address the evidence he presented, it not being relevant to whether the State put on a prima facie case for conviction of the crime charged.

[3] Sexual battery on an adult by an adult, including "vaginal penetration by, or union with, the sexual organ of another," requires lack of the putative victim's "consent," defined to mean "intelligent, knowing, and voluntary consent." § 794.011(1)(a), Fla. Stat. By itself, the crime is classified as a second-degree felony. *Id.* (5)(b). It becomes the more serious first-degree felony if the sexual battery occurred "under any of the circumstances listed in paragraph (e)," those circumstances including "the victim['s being] physically helpless to resist"—that is, "unconscious, asleep, or for any other reason physically unable to communicate unwillingness to an act." *Id.* (1)(e), (4)(b), (e)1.

1. Fogarty committed an act upon or with J.W. [the victim] in which his sexual organ penetrated or had union with her vagina.

2. Fogarty did so without J.W.'s "consent."

3. J.W., at the time, was "physically helpless to resist."

4. At the time, J.W. was eighteen years of age or older.

5. At the time, Fogarty also was eighteen years of age or older.

*Cf.* § 794.011(4)(b), (e), Fla. Stat. There being no dispute about the first, fourth, and fifth of these, Fogarty focuses on the second and third.

To be sure, it is the State's burden to prove every element of a charged crime. *See Campbell v. State*, 109 So. 809, 810 (Fla. 1926). Yet a trial court must not take a criminal case away from a jury and render a judgment of acquittal as a matter of law "unless it be apparent that no sufficient evidence has been submitted upon which the jury could legally find a verdict of guilty." *Adams v. State*, 189 So. 392, 393 (Fla. 1939). A defendant moving for a legal acquittal effectively "admits not only the facts stated in the evidence adduced, but also [] every conclusion favorable to the adverse party that a jury might *fairly and reasonably infer* from the evidence." *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974) (emphasis supplied). For us to conclude the trial court erred in not granting Fogarty's motion, the evidence presented by the State must have been so wanting "that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." *Id.*

In conducting our analysis of the question, we look to whether the State presented sufficient evidence—that is, both having some weight (more than a mere scintilla) and being the type on which one reasonably could rely as proof—as to each element of the offense as part of its case-in-chief. *See Baugh v. State*, 961 So. 2d 198, 203–04 (Fla. 2007) (stating the "well established" rule that a judgment of acquittal is required if the State fails "to present a

prima facie case" as to "each and every element of the offense charged" (internal quotation and citation omitted)); *Scott v. State*, 389 So. 3d 672, 675−77 (Fla. 1st DCA Mar. 6, 2024) (Tanenbaum, J., concurring) (discussing quantitative and qualitative components of evidence sufficiency); *see also McClellan v. State*, 63 So. 419, 419 (Fla. 1913) ("[W]here there is some substantial competent evidence of all the facts legally essential to support the verdict . . . a refusal of the trial court to grant a new trial on the ground of the insufficiency of the evidence to sustain the verdict will not be disturbed by the appellate court.").

A key legal point here, missed by Fogarty on appeal, is that not just direct or circumstantial evidence counts toward the sufficient-evidence assessment, but also all reasonable inferences that could be drawn from that evidence to conclude the element has been adequately demonstrated. *Cf. Tibbs v. State*, 397 So. 2d 1120, 1123 (Fla. 1981), *aff'd sub nom. Tibbs v. Florida*, 457 U.S. 31 (1982) ("Rather, the concern on appeal must be whether, after all conflicts in the evidence and *all reasonable inferences* therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment." (emphasis supplied)). True, the evidence in the State's case showed that neither J.W. nor Fogarty recalled the two having sex the night of the incident. There, however, was ample evidence tending to show J.W.'s debilitating state of drunkenness and Fogarty's contrasting state of lucidity around the same time. After all, it was Fogarty himself that recalled—just a few hours later—dragging J.W., passed out, onto the couch. He remembered enough to know he had not had sex with her beforehand and to know he had run out the back of the apartment sometime thereafter, but he could not recall what happened once J.W. was on the couch.

Fogarty simply fails to account for his own statement to police the morning of the incident, which made him the last person to have seen J.W. on the couch sometime after 3:00 in the morning—passed out and, according to him, her pants still on but wet—before Shawn found J.W.—her breasts exposed, her pants pulled down, and her underwear pulled to the side, exposing her vaginal area—when Shawn woke up at 5:45 in the morning. A jury reasonably could put this evidence together with the evidence showing Fogarty's semen on J.W.'s underwear and in her vagina and *infer*

9

that Fogarty had sex with her only after she was so drunk that there was no way she could have given intelligent, knowing, and voluntary consent. Given the timing of the events—Fogarty's leaving her on the couch where she was found by Shawn—there also was enough evidence from which the jury could reasonably infer that the sex occurred after J.W. had passed out (*i.e.*, was "unconscious"). On this record, we cannot say the State failed to present sufficient evidence to demonstrate a prima facie case of Fogarty's guilt under the offense charged, Fogarty then not being entitled to an acquittal as a matter of law.

Having limned the role inference plays in a sufficiency-of-evidence assessment, we want to be clear that *each* inference mentioned here could reasonably be drawn from direct evidence the State introduced as part of its case-in-chief (*e.g.*, testimony plus the recorded statement Fogarty gave to police). *Cf. Davis v. State*, 90 So. 2d 629, 631 (Fla. 1956) (characterizing "direct evidence" as "that to which the witness testifies of his own knowledge as to the facts at issue," and "circumstantial evidence" as "proof of certain facts and circumstances from which the trier of fact may *infer* that the ultimate facts in dispute existed or did not exist" (emphasis supplied)). An inference is a permissible analytical move a factfinder may make in determining whether a proponent of a factual proposition has met the legally required burden of proof. *Cf. Voelker v. Combined Ins. Co. of Am.*, 73 So. 2d 403, 406 (Fla. 1954) ("Of course if none of the inferences on the one hand accords with logic and reason or human experience, while on the other hand an inference which does square with logic and reason or human experience is deducible from the evidence, the question is not for the jury but is one of law for the court."); *Shepherd v. Finer Foods, Inc.*, 165 So. 2d 750, 754 (Fla. 1964) ("So often astute lawyers fail to appreciate the fact that when this Court has spoken of inferences which may be drawn from circumstantial evidence it meant assuredly that such inferences had to be susceptible of being deduced from within the periphery of the sphere of the circumstantial evidence and that when one goes beyond such point he has entered the field of conjecture and speculation.").

One can legally infer conclusions from circumstantial evidence so long as the inference "is based upon some material or

reasonable conclusion, evidently deducible from an undenied and proven fact." *Newton v. State*, 21 Fla. 53, 101 (1884). Moreover,

> [i]f the circumstance be such as affords a fair and reasonable presumption of the fact to be tried[,] it is to be received and left to the action of the minds of the jury, whose duty it is to determine its precise force and effect from the circumstances proved, and whether they are sufficiently satisfactory and convincing to justify them in finding the fact in issue.

*Id.* Inference, then, is not evidence. It must be rooted in admitted evidence, meaning a fact-finder typically cannot draw an inference from an inference (sometimes called "inference-stacking"), our review for evidence sufficiency likewise ensuring an inference does not substitute for direct evidence that is lacking. *But cf. Voelker*, 73 So. 2d at 407 (acknowledging "often-stated rule against laying inference upon inference," which "protect[s] litigants from verdicts or judgment based upon speculation," but also noting that the rule "must yield" to an exception for the "inescapable inference," on which a second inference may still be based).

When we say a reasonable jury could infer that the sex Fogarty indisputably had with J.W. both lacked the requisite consent and occurred while J.W. was unconscious, we mean there were "parallel inference[s]" to be drawn—"[e]ach fact inferred [being] independent of the other," rather than being "stacked." *Castillo v. E.I. Du Pont De Nemours & Co., Inc.*, 854 So. 2d 1264, 1279 (Fla. 2003). Lack of consent could be inferred from the direct evidence that showed J.W.'s debilitating drunkenness from 2:00 in the morning on. J.W.'s state of unconsciousness when Fogarty had sex with her could be inferred from the direct evidence of his dragging her to the couch with her pants on and leaving her there after she passed out and of his semen in her vagina and on her underwear waistband after she later was found on the same couch with her pants pulled down.

We find no reversible error in the judgment of conviction or in the sentence.

AFFIRMED.

BILBREY and NORDBY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Jessica J. Yeary, Public Defender, Danielle Jorden, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, Adam B. Wilson, Assistant Attorney General, Tallahassee, for Appellee.